IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| **DAVAYON J. SAUNDERS,**<br>    Plaintiff,<br><br>v.<br><br>**DAPHNE NORMAN,**[1] **etc.,**<br>    Defendant | )<br>)<br>)  Civil Action No. 7:21cv00112<br>)<br>)<br>)  <u>**MEMORANDUM OPINION**</u><br>)<br>)  By: Pamela Meade Sargent<br>)  United States Magistrate Judge<br>)<br>) |

Plaintiff, Davayon J. Saunders, ("Saunders"), a Virginia Department of Corrections, ("VDOC"), prisoner formerly incarcerated at the Roanoke City Jail, ("Jail"), has filed this civil rights action pursuant to 42 U.S.C. §1983, against Daphne Norman, ("Norman"), the head nurse at the Jail, alleging that his Eighth Amendment rights under the U.S. Constitution were violated. This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). This case is before the court on Norman's motion for summary judgment. (Docket Item No. 63) ("Motion"). For the reasons stated below, I will grant the Motion.

*I. Facts*

In his Complaint, (Docket Item No. 1), filed on February 23, 2021, and which was sworn, Saunders alleged that Norman denied him medical care and put him "in the hole" because he contracted COVID-19. (Docket Item No. 1 at 2.) He also said

---

[1] In her Answer, the defendant refers to herself as Daphne, rather than "Daphine."

-1-

that his mental health was bad because he felt like "nobody was caring about" him. (Docket Item No. 1 at 2.) Saunders stated that he had bad chest pains every day, so he had the deputies at the Jail call the nurse for him. He said that Norman had the "jail movement people" to move him "in the hole and not to medical." (Docket Item No. 1 at 3.) Saunders stated that no nurse checked on him while he was "in the hole." (Docket Item No. 1 at 3.) Saunders specifically stated that he tried to call a nurse to talk to him on February 16, 2021, at 2 p.m., but a deputy came to "the hole" at 3:45 p.m. and gave him a medical form. The deputy said the nurses said to fill out the form because they did not want to talk to him. Saunders stated, "… Norman is not caring about me or no other inmate that have COVID-19." (Docket Item No. 1 at 3.)

Saunders filed a response in opposition to the Motion, but it is not sworn or made under penalty of perjury. (Docket Item No. 69.) In fact, Saunders has filed numerous pleadings in response to the Motion, which are not sworn and will not be considered as evidence on the Motion. *See* Docket Item Nos. 71, 73, 75, 76, 78.

Saunders also filed a sworn Affidavit in opposition to the Motion. (Docket Item No. 73-1.) In his Affidavit, Saunders stated that Norman was the "head nurse and had full control to step up and say something." (Docket Item No. 73-1 at 1.) Saunders stated that his testing positive of COVID-19 "would seem serious enough … to warrant oversight" by Norman. (Docket Item No. 73-1 at 2.) Saunders also stated that, while he was in medical isolation, his behavior in refusing to take medication and to allow his vitals to be taken was documented and should have prompted the defendant to check on him or to review his medical folder. He said that this lack of action by Norman did "not comply with the defendant's job title and responsibilities." (Docket Item No. 73-1 at 2.) Saunders alleged that he was a COVID-19 positive patient placed in medical isolation based on protocols set forth

by the Jail's physician, Medical Director, Nurse Practitioner and a physician at the local Health Department, yet Norman did not check on him or review his file to determine if COVID-19 protocols were being followed. Saunders stated, "The defendant deliberately moved with a plan of non-action in order to punish the plaintiff for [allegedly] flirting with 'her nurses.'" (Docket Item No. 73-1 at 3.)

In support of the Motion, Norman filed a sworn Declaration. (Docket Item No. 64-1.) In this Declaration, Norman stated that she became a registered nurse in 2011. Prior to that, she was licensed as a licensed practical nurse in 2002. Norman stated that she worked at the Jail from September 2014 through April 2021; from July 24, 2018, to April 2021, she was the Health Services Administrator at the Jail. Health Services Administrator, Norman said, is an administrative position which involved oversight of the health care provided to inmates of the Jail, coordination of health care provider staffing, review and implementation of healthcare-related policies and ensuring compliance with applicable contractual responsibilities, regulations and laws.

Norman stated that, pursuant to governmental mandates, she, along with the Jail's physician Medical Director, the Nurse Practitioner, a physician at the local Health Department and the Sheriff's Department Administration, created the Jail's plan to isolate COVID-19 positive inmates to help prevent the spread of the infection and for the protection of all inmates and staff. She said placing COVID-positive inmates in isolation was not for a disciplinary purpose. When inmates were on medical isolation, they were monitored frequently by the medical staff. Norman stated that it was not possible or practical to place COVID-positive inmates in the Medical Unit if they were medically stable, as Saunders was, as the Medical Unit was where the most medically compromised inmates who were most likely to

become infected and become unstable and require hospitalization were being housed.

Norman stated, at no time did Saunders's COVID-19 infection require a higher level of care. According to Norman, Saunders was placed in segregation at the Jail in August 2020 due to an altercation. Inmate housing changes for disciplinary reasons were "Deputy decisions," and they were not made by medical providers. She said that Saunders tested positive for COVID-19 on January 28, 2021. That same day, he submitted a Grievance that he wanted to go to the hospital. Based on the Jail policy at that time, Saunders was placed on medical isolation to prevent the spread of the virus and for the protection of other inmates and staff. According to Norman, medical staff went to see Saunders multiple times per day. Norman stated that, according to the Jail's medical records, Saunders refused to have his vital signs taken on nine occasions from January 29 to February 9, 2021. She said he also repeatedly refused cough medication and vitamin D that had been prescribed for him.

Norman stated that, whenever Saunders reported chest pain, he was assessed by a health care provider. Norman stated that the Jail's protocol regarding chest pain required the nursing staff to run an electrocardiogram, ("EKG"), on an inmate if his complaints were deemed even potentially cardiac related. This EKG would be reviewed by an on-site nurse practitioner or physician. If any abnormality had been found, a physician would have made a determination about the level of care needed. Also, any time there was a potential concern for a cardiac origin for a chest pain complaint, a nurse practitioner or a physician would see the inmate.

Norman stated that she never provided any direct clinical care to Saunders. She stated that the only date on which she had any involvement with Saunders's

health care was on October 22, 2020, when she reviewed his chart and determined that he had not undergone a dental examination since his incarceration at the Jail, and she scheduled a dental examination for him. Norman stated that the medical staff who did provide direct care to Saunders "provided treatment and intervention in a manner consistent with this inmate's clinical symptoms, physical findings, and in accord with applicable policies for the health and safety of all inmates and staff during the ongoing pandemic." (Docket Item No. 64-1 at 8.) Norman stated that Saunders's COVID-19 infection did not require any higher level of care than that provided. Norman further said that she had never been deliberately indifferent to Saunders's medical needs.

According to Norman, a true and accurate copy of Saunders's Jail medical records from this period are attached as Exhibit B to the Motion. (Docket Item No. 64-2.) These medical records show that, on January 8, 2021, Alexis Boothe, L.P.N., conducted a chest pain (non-acute) evaluation on Saunders. (Docket Item No. 64-2 at 153.) Saunders reported that he had experienced mild chest pain over the left chest, substernal area for less than 24 hours. He said the pain, which he described as burning, dull/achy and intermittent, did not radiate. He did not report any shortness of breath or dizziness/lightheadedness. (Docket Item No. 64-2 at 153.) His heart rate was normal, and his heart rhythm was regular with no murmurs. His breathing rate and depth were normal, and his breathing was unlabored and normal. His chest pain was not reproducible through palpation of the chest. His lung sounds were clear to auscultation. An EKG was ordered. Boothe noted that Saunders's symptoms were not consistent with cardiac chest pain. (Docket Item No. 64-2 at 157.) Boothe recommended calcium carbonate, and a prescription for Mylanta was written. She told Saunders to report continuing pain or lack of improvement.

Saunders submitted a sick call request on January 21, 2021, stating that he had chest pain all day. (Docket Item No. 64-2 at 96.) Saunders's blood pressure was 123/85; his temperature was 96; his pulse was 88; his respiration rate was 16; and his blood oxygen saturation level was 98 percent. Rebecca Olsen, R.N., noted that Saunders complained of mid-chest pain that did not radiate. Saunders was given Mylanta and instructed to call or complete another sick call request if he continued to have pain. Olsen noted that Saunders had no shortness of breath and was able to ambulate without assistance. Nurse Practitioner Crystal M. Davis noted on January 26, 2021, that Saunders refused to be seen when she went to his cell to check him for recent "chest complaints." (Docket Item No. 64-2 at 95.)

Saunders tested positive for COVID-19 on January 28, 2021. (Docket Item No. 64-2 at 263.) Davis ordered that Saunders's vital signs be taken twice a day from January 28 to February 11, 2021. (Docket Item No. 64-2 at 359.) Olsen saw Saunders at 10:30 p.m. on January 28, 2021. Olsen noted that Saunders's lungs were clear to auscultation. Saunders complained of chest pain, which worsened with coughing. On January 29, 2021, at 1:37 p.m., Nicole Martin, H.S.A., noted that Saunders's mother had contacted Captain M. Perkins, stating that Saunders was in distress and having trouble breathing. (Docket Item No. 64-2 at 95.) Martin wrote that she and N. Warren, L.P.N., immediately went to assess Saunders. She noted that Saunders was in no acute distress with lungs auscultated. Martin noted that she spoke to Saunders at length regarding his COVID-19 diagnosis and treatment. She educated Saunders that, just because he had been diagnosed with COVID-19, it did not mean that he needed to be hospitalized. She noted that she gave Saunders time to ask any questions and talk about concerns. She noted that Saunders verbalized his fear regarding his diagnosis and being in jail with COVID-19. Martin reiterated to Saunders that he was being monitored multiple times daily, and, if he had any

problems, or was in any distress, to let the deputies know, and the nurses would be down to assess and treat him. Saunders told Martin he was not in any distress, but he was experiencing feelings of anxiety and fear. At the end of the conversation, Martin noted, Saunders stated that he was more at ease and felt more comfortable. He thanked them for educating him and spending that much time listening. Martin noted that Saunders returned to the pod, ambulating on his own. Heather Glenn, R.N., saw Saunders on January 29, 2021, at 7:36 p.m., and she noted that he complained of a headache but denied any other symptoms or complaints. (Docket Item No. 64-2 at 89.) On January 31, 2021, Olsen noted Saunders's lung sounds were clear to auscultation. (Docket Item No. 64-2 at 90.)

From January 29 to February 3, 2021, it was noted that Saunders refused his vitamin D. (Docket Item No. 64-2 at 149-52, 366-67.)

On February 1, 2021, at 10:37 a.m., Erika Bolton, R.N., noted that Saunders's lung sounds were clear to auscultation. (Docket Item No. 64-2 at 92.) At 1:16 p.m., on February 1, 2021, Bolton noted that she was called to the pod due to Saunders complaining of chest tightness/shortness of breath. (Docket Item No. 64-2 at 90.) Bolton noted that Saunders ambulated well and stood without difficulty. According to Bolton's note, Saunders told her that he had been "exercising hard for the last little while." (Docket Item No. 64-2 at 90.) Saunders denied any numbness, nausea, pressure or tightness. His respiration rate was 19 per minute and unlabored. His lips were pink. His blood pressure was 122/96; his heart rate was 103; and his blood oxygen saturation rate was 97 percent. Saunders stated that his chest did not hurt when he breathed in or out, but he just noticed that he "felt kind of funny after working out so hard." (Docket Item No. 64-2 at 90.) Bolton noted that Saunders's

lung sounds were clear upon auscultation. She recommended that Saunders drink plenty of fluids and to alert staff if these feelings did not improve.

At 9:53 a.m. on February 2, 2021, Trisha Whittaker, Medical Specialist, noted that Saunders refused his vitamin D. (Docket Item No. 64-2 at 148.)

On February 2, 2021, Davis saw Saunders, and she noted that he had COVID-19 and presented with chest pain/tightness and a productive cough. Saunders rated his pain level at a 5 out of 10. (Docket Item No. 64-2 at 92.) Saunders's temperature was 98.6; his blood pressure was 120/88; his pulse rate was 86; his respiration rate was 15; and his blood oxygen saturation rate was at 98 percent. Davis noted that Saunders was in no acute distress. Saunders's nose and throat were clear, and none of his head/neck lymph nodes were palpable. His respiration was even and nonlabored, and his lungs were clear with equal excursions. Davis noted that she doubted Saunders's symptoms were of cardiac origin. She assessed him with respiratory illness and noted that he would continue to be monitored. Davis prescribed an expectorant, vitamin D and Tylenol.

At 7:58 a.m. on February 3, 2021, Whittaker noted that Saunders refused his vitamin D and expectorant medication. (Docket Item No. 64-2 at 147.)

On February 3, 2021, Martin noted that Saunders filed a Grievance for having chest discomfort and shortness of breath. Saunders was assessed cell side. (Docket Item No. 64-2 at 95.) No acute distress was noted. Saunders's blood oxygen saturation rate was 99 percent, and his lungs were clear to auscultation. Martin wrote that she had a long conversation about COVID-19 symptoms, and she urged

Saunders to continue to get up for medication pass to receive his cough medicine and vitamins. Saunders stated that he understood.

On February 4, 2021, Venson Warden, R.N., noted that Saunders complained of chest pain and shortness of breath. Warden stated he or she assessed Saunders in the pod. (Docket Item No. 64-2 at 92.) His blood oxygen saturation rate was 99 percent; his heart rate was 78; and his lungs were clear to auscultation. Warden noted that Saunders requested his Vitamin D. Warden noted that he or she would continue to monitor Saunders. At 7:50 a.m. on February 4, 2021, Racheal Boon, Medical Technician, noted that Saunders refused his vitamin D and expectorant medication. (Docket Item No. 64-2 at 146.)

On February 5, 2021, Amy Warren, L.P.N., conducted a chest pain (non-acute) evaluation on Saunders. (Docket Item No. 64-2 at 140.) Saunders reported that he had experienced chronic sharp/stabbing chest pain over the right chest that did not radiate. He did not report any nausea/vomiting, sweaty/clammy skin, cough, shortness of breath or dizziness/lightheadedness. (Docket Item No. 64-2 at 140-41.) He reported that food and drink were provoking/aggravating factors. His heart rate was normal, and his heart rhythm was regular with no murmurs. His breathing rate and depth were normal, and his breathing was unlabored and normal. His chest pain was not reproducible through palpation of the chest. His lung sounds were clear to auscultation. An EKG was ordered. Warren noted that Saunders's symptoms were not consistent with cardiac chest pain. (Docket Item No. 64-2 at 144.) She recommended calcium carbonate.

On February 7, 2021, at 8:16 a.m., Saunders refused his vitamin D and expectorant medication. (Docket Item No. 64-2 at 139.)

On February 8, 2021, Warren noted Saunders was moved to segregation for medical observation due to multiple reported concerns and daily calls for evaluation. (Docket Item No. 64-2 at 90.) On February 18, 2021, Saunders was returned to general population. (Docket Item No. 64-2 at 95.) According to Norman, Saunders made no complaints of chest pain while housed in segregation for medical observation. (Docket Item No. 64-1 at 7.)

A Psychiatric Progress Note, dated February 11, 2021, stated that Saunders reported being frustrated about his current situation being in segregation for medical observation. (Docket Item No. 64-2 at 244.) Otherwise, he had no complaints.

On April 28, 2021, Boothe conducted a chest pain (non-acute) evaluation on Saunders. (Docket Item No. 64-2 at 113.) Saunders reported that he had experienced mild chest pain over the left chest, substernal area for less than 24 hours. He said the pain, which he described as dull and intermittent, did not radiate. He did not report any shortness of breath or dizziness/lightheadedness. (Docket Item No. 64-2 at 114.) His heart rate was normal, and his heart rhythm was regular with no murmurs. His breathing rate and depth were normal, and his breathing was unlabored and normal. His chest pain was not reproducible through palpation of the chest. His lung sounds were clear to auscultation. An EKG was ordered. Boothe noted that Saunders's symptoms were not consistent with cardiac chest pain. (Docket Item No. 64-2 at 117.) Boothe noted that Saunders got off of the elevator laughing, joking and yelling for other inmates. She noted that Saunders was in no acute distress, "flirting" with her. (Docket Item No. 64-2 at 118.) Saunders's medical records contain the results of an April 29, 2021, EKG. (Docket Item No. 64-2 at 408.) According to Norman, the results of this EKG were completely normal. (Docket Item No. 64-1 at 7.)

Inmate Grievance – Medical - #8,081,836 was included among Saunders's medical records. (Docket Item No. 64-2 at 358.)[2] On January 26, 2021, Saunders wrote: "I go home May 6 y'all need to let the person running the jail do his job and let people go that's a year or less instead of holding people and everybody get covid-19 in here." On January 28, 2021, at 5:33 p.m. Saunders wrote: "And to add to this [I] have Covid-19 I need real medical attention can y'all take me to the hospital please my head is so hot and my [chest] hurt please take me to the hospital [I] told y'all to get [in touch] with Doc to let me out early they told my mother [I] get out May 6 I need help please." The Grievance does not contain any response.

## II. Analysis

In support of her Motion, Norman argues that summary judgment should be entered in her favor because there is no genuine dispute of fact, and the undisputed facts fail to establish a constitutional violation. In particular, Noman argues that she had no direct involvement with Saunders's medical treatment surrounding his COVID-19 diagnosis or his complaints of chest pain in January 2021. She further argues that undisputed evidence shows that Saunders cannot demonstrate the subjective component of his deliberate indifference claim, in that he has not shown that Norman knew of and ignored a serious need for medical care. She further argues that Saunders's allegations amount to a disagreement as to the proper treatment of COVID-19 and/or chest pain, which does not rise to the level of deliberate indifference to the serious medical need necessary to prove a violation of the Eighth

---

[2] This Grievance also was submitted at Exhibit D to Norman's Declaration. (Docket Item No. 64-4 at 2.)

Amendment. Lastly, Norman argues that Saunders's allegations also do not plead a cause of action for supervisory liability.[3]

With regard to a motion for summary judgment, the standard for review is well-settled. The court should grant summary judgment only when the pleadings, responses to discovery and the record reveal that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a); *see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In considering a motion for summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587. To be successful on a motion for summary judgment, a moving party "must show that there is an absence of evidence to support the non-moving party's case" or that "the evidence is so one-sided that one party must prevail as a matter of law." *Lexington-South Elkhorn Water Dist. v. City of Wilmore, Ky.,* 93 F.3d 230, 233 (6th Cir. 1996). When a motion for summary judgment is made and is properly supported by affidavits, depositions or answers to interrogatories, the nonmoving party may not rest on the mere allegations

---

[3] Norman also argues that summary judgment should be entered in her favor because Saunders failed to exhaust his administrative remedies before filing suit. Exhaustion of remedies, however, is an affirmative defense on which the defendant bears the burden of proof. *See Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) (citing *Jones v. Bock*, 549 U.S. 199 (2007)). Here, Norman has provided the court with no evidence that the Jail has administrative remedies or that Saunders failed to exhaust those remedies before filing suit. The only evidence before the court shows that Saunders did file a Grievance, complaining of the lack of medical care for his COVID-19 symptoms.

or denials of the pleadings. *See Oliver v. Va. Dep't of Corrs.*, 2010 WL 1417833, at *2 (W.D. Va. Apr. 6, 2010) (citing FED. R. CIV. P. 56(e)). Instead, the nonmoving party must respond by affidavits or otherwise and present specific facts from which a jury could reasonably find for either side. *See Anderson*, 477 U.S. at 256-57.

The Eighth Amendment to the U.S. Constitution not only prohibits excessive sentences, but it also protects inmates from inhumane treatment and conditions while imprisoned. *See Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). This includes a requirement that a state provide medical care to those it punishes by incarceration. *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976). For a prisoner to prevail on a constitutional claim for denial of medical care, he must demonstrate that a defendant's acts or omissions amounted to deliberate indifference to his serious medical needs. *See Estelle*, 429 U.S. at 106. In essence, treatment rendered must be so grossly incompetent, inadequate or excessive to shock the conscience or to be intolerable to fundamental fairness. *See Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citation omitted).

With regard to a prisoner's medical treatment, a prison official is deliberately indifferent if she knows of, but disregards, an inmate's serious medical need. *See Farmer v. Brennan*, 511 U.S. 825, 844-45 (1994). Deliberate indifference involves both an objective and a subjective component. *See Shelton v. Angelone*, 148 F. Supp. 2d, 670, 678 (W.D. Va. 2001). The objective component is met by showing that a prisoner's medical need is sufficiently serious. *See Shelton*, 148 F. Supp. 2d at 678. A medical need serious enough to give rise to a constitutional claim involves a condition that places the inmate at a substantial risk of serious harm, usually loss of life or permanent disability, or a condition for which lack of treatment perpetuates severe pain. *See Farmer*, 511 U.S. at 832-35; *Sosebee v. Murphy*, 797 F.2d 179, 182-

83 (4th Cir. 1986); *Loe v. Armistead*, 582 F.2d 1291, 1296-97 (4th Cir. 1978); *Rush v. Vandevander*, 2008 WL 495651, at *1 (W.D. Va. Feb. 21, 2008). To meet the subjective component, evidence must show that the prison official subjectively recognized the serious medical need. *See Shelton*, 148 F. Supp. 2d at 678. It is not sufficient that the official should have recognized it; the official must actually have known of it. *See Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). The evidence also must show that the prison official subjectively recognized that her actions were "inappropriate in light of that risk." *Rich*, 129 F.3d at 340 n.2. It is insufficient that the official should have recognized that her actions were insufficient. *See Brown v. Harris*, 240 F.3d 383, 390-91 (4th Cir. 2001).

Questions of medical judgment are not subject to judicial review. *See Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975). A claim regarding a disagreement between an inmate and medical personnel over diagnosis or course of treatment and allegations of malpractice or negligence in treatment do not state cognizable constitutional claims. *See Miltier*, 896 F.2d at 851-52; *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Estelle*, 429 U.S. at 105-06. An inmate is not entitled to unqualified access to health care; the right to medical treatment is limited to that treatment which is medically necessary and not to "that which may be considered merely desirable." *Jasper v. Mullins*, 2007 WL 3339605, at *2 (W.D. Va. Nov. 8, 2007) (quoting *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977)). To establish liability under Section 1983, a plaintiff must prove that the defendant "acted personally in the deprivation of the plaintiff's rights." *Wright*, 766 F.2d at 850. Therefore, it is insufficient to show that the prison system, generically, failed to provide adequate medical care to an inmate.

While Norman concedes that COVID-19 and/or complaints of chest pain could present a serious medical need, Saunders has produced no evidence that Norman was aware of any serious medical need by Saunders. Norman has provided evidence that she never provided any direct clinical care to Saunders. In fact, Norman stated that the only date on which she had any involvement with Saunders's health care was on October 22, 2020, when she reviewed his chart and determined that he had not undergone a dental examination since his incarceration at the Jail, and she scheduled a dental examination for him. Furthermore, Norman has stated that, upon review of Saunders's medical records from the relevant period as a result of this litigation, Saunders was provided with appropriate medical care at the time.

In his Affidavit, Saunders stated that Norman was the "head nurse and had full control to step up and say something." Saunders stated that his testing positive of COVID-19 "would seem serious enough … to warrant oversight" by Norman. Saunders also stated that, while he was in medical isolation, his behavior in refusing to take medication and to allow his vitals to be taken was documented and should have prompted the defendant to check on him or to review his medical folder. He said that this lack of action by Norman did "not comply with the defendant's job title and responsibilities." Saunders alleged that he was a COVID-19 positive patient placed in medical isolation based on protocols set forth by the Jail's physician, Medical Director, Nurse Practitioner, and a physician at the local Health Department, yet Norman did not check on him or review his file to determine if COVID-19 protocols were being followed.

As stated above, it is not sufficient that a defendant should have recognized that the plaintiff suffered from a serious medical need that was not being properly addressed. To amount to deliberate indifference, there must be evidence that the

defendant actually knew of it. Saunders has produced no such evidence on the part of Norman. Based on this, I find that there is no genuine dispute as to any material fact, and I will enter summary judgment in the defendant's favor.

An appropriate Order will be entered.

**ENTERED**: September 7, 2022.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE